CTJ/RMT

ORIGINAL

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

DROP BOX
JUL - 8 2009
5:28

CLERK, U.S. DISTRICT COURT
By _____
                Deputy

| | | |
|---|---|---|
| TERRENCE EYLES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No. 4:08-cv-577-A |
| | § | |
| ULINE, INC., | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT ULINE, INC.'S**
**BRIEF IN SUPPORT OF ITS MOTION FOR**
**FINAL SUMMARY JUDGMENT AS TO ALL CLAIMS**

William L. Davis, Esq.
Attorney-in-Charge
State Bar No. 0556380
davisw@jacksonlewis.com
Caroline Ibironke, Esq.
State Bar No. 24050803
ibironkec@jacksonlewis.com
Jackson Lewis, LLP
3811 Turtle Creek Boulevard, Suite 500
Dallas, Texas 75219
PH:     (214) 520-2400
FX:     (214) 520-2008

**ATTORNEYS FOR DEFENDANT**
**ULINE, INC.**

# TABLE OF CONTENTS

I.    SUMMARY OF THE ARGUMENT ................................................................. 1

II.   UNDISPUTED FACTS ................................................................................. 2

    A.   Plaintiff's Job at Uline ................................................................ 2

    B.   Plaintiff's Performance Issues and Reactions to Counseling ......................... 3

    C.   Plaintiff's Behavioral Issues ................................................................. 4

    D.   Plaintiff Disregarded Henegar's Directive................................................... 6

    E.   Plaintiff's Complaint to the Department of Labor........................................ 8

III.  ARGUMENT AND AUTHORITIES................................................................. 8

    A.   OVERTIME UNDER THE FLSA............................................................. 8

        1.  Plaintiff is not owed any overtime pay for "gap time." ......................... 8
        2.  Uline's rounding and changes to time records do not violate the FLSA ................ 9

    B.   FLSA RETALIATION ................................................................. 10

        1.  Burden of proof........................................................................... 10
        2.  Protected activity under the FLSA......................................................... 11
        3.  Plaintiff did not make a protected complaint prior to his discharge ................... 12
        4.  Uline had legitimate, non-retaliatory reasons for discharging Plaintiff................ 13
        5.  Plaintiff cannot meet his ultimate burden of proof................................. 13

IV.   CONCLUSION........................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

### **FEDERAL CASES**

*Adair v. City of Kirkland*, 185 F.3d 1055 (9th Cir. 1999)....................................................9

*Douglas v. Dyn McDermott Petroleum Operations Co.*, 144 F.3d 364 (5th Cir. 1998) ...............................................................................................................13

*Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617 (5th Cir. 2008) .......................10, 11, 12

*Hashop v. Rockwell Space Operations Co.*, 867 F. Supp. 1287 (S.D. Tex. 1994)......13, 14

*Hensley v. MacMillan Blodel Containers, Inc*, 786 F.2d 353 (8th Cir. 1986)....................9

*Jeffries v. Harris County Community Action Association*, 615 F.2d 1025 (5th Cir. 1980) .............................................................................................................12

*Kasten v. Saint-Gobain Performance Plastics Corp.*, *2009* U.S. App. LEXIS *13913 (7th Cir. 2009)* ...............................................................................................11

*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326 (5th Cir. 2000), *citing 29 U.S.C. § 207*.......................................................................................8

*Pacheco v. Witing Farms, Inc.*, 365 F.3d 1199 (10th Cir. 2004).......................................14

### **FEDERAL STATUTES**

*29* U.S.C. *§215(a)(3)* ...........................................................................................................11

29 C.F.R. § 785.48 ...............................................................................................................9

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| TERRENCE EYLES, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| V. | § | Civil Action No. 4:08-cv-577-A |
| | § | |
| ULINE, INC., | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT ULINE, INC.'S
## BRIEF IN SUPPORT OF ITS MOTION FOR
## FINAL SUMMARY JUDGMENT AS TO ALL CLAIMS

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Defendant, Uline, Inc. ("Defendant") or ("Uline"), and files this *Defendant Uline, Inc.'s Brief in Support of Its Motion for Final Summary Judgment as to All Claims.*

### I.        SUMMARY OF THE ARGUMENT

Eyles claims he is owed unpaid overtime under the Fair Labor Standards Act. The only claim relates to Uline, on a few occasions, adjusting his time records. He contends that Uline had no right to make the adjustments and this resulted in a violation of the Fair Labor Standards Act. He also claims he was retaliated against for challenging the practice and making a claim with the Department of Labor.

Uline's timekeeping system, which rounded to the nearest 15-minute interval, complies with the DOL regulations. The only adjustments being made to the records related to time not actually worked and to correct errors. For example, when employees would finish their

shift and go stand by the time clock waiting for it to "click over" to be paid for an extra 15 minutes, Uline would adjust their time to reflect actual time worked. Adjusting time records to account for time not worked is permissible under the FLSA.

Further, since the FLSA's overtime provisions are not triggered until employees actually work more than 40 hours during a week, and Uline was providing paid lunch periods, minor adjustments were not taking away overtime hours. In other words, employees were already being paid more than the FLSA requires (for hours not worked while they were at lunch) and Uline had a cushion in which to make adjustments. The case law refers to this as "gap time."

With respect to his retaliation claim, Eyles did not make a protected complaint while employed by Uline which could form the basis for a retaliation claim. Although he complained to the Department of Labor, the complaint was not made until after he was discharged and Uline could not have retaliated against a complaint that had not yet been made. Eyles had documented performance, attendance, and behavioral issues, and complained about a number of issues while employed by Uline, but none of his complaints related to unpaid overtime. Finally, even if he had complained, Uline had legitimate, non-retaliatory reasons for the discharge.

## II.     UNDISPUTED FACTS

### A.     PLAINTIFF'S JOB AT ULINE

Uline distributes shipping, industrial, and packaging supplies throughout the United States.[1] Eyles was hired to work in Uline's Coppell, Texas, warehouse "picking" orders

---

[1] App. 1-3.

and "packing" them to be shipped to customers.[2]   He later became a "cycle counter" which

involves counting inventory in the warehouse.[3]   The Coppell facility is managed by Jim Henegar,

the Branch Manager.[4]

## B.   PLAINTIFF'S PERFORMANCE ISSUES AND REACTIONS TO COUNSELING

Eyles had a number of "picking errors" in his first assignment.[5]   He would

essentially pull the wrong items from inventory, ship them to customers, and the customers

would complain.[6]   He received two performance improvement plans relating to these errors.[7]

Eyles admits to making the errors and the customers complaining, but argued with Uline over

whether the percentage error rate was correct.[8]   His arguing with the Company regarding this

was troubling because he admits the number of errors noted in one of the performance

improvement plan was correct – 16 errors – but claims the Company's math in calculating the

percentage – a .18 percent error rate was not correct.[9]   Regardless of the exact percentage, he

admits that it was a significant problem for him to be shipping the wrong merchandise 16 times

to customers.[10]   This was one of many times when Eyles would argue for the sake of arguing

while losing sight of what was important – (the big picture of customers getting the wrong order

16 times v. the precise error rate being .17 or .18).[11]

---

[2]   App. 5.
[3]   App. 6.
[4]   App. 1-3.
[5]   App. 7.
[6]   *Id.*
[7]   App. 15-16; App. 46; App. 47.
[8]   App. 15-17.
[9]   App. 17.
[10]   *Id.*
[11]   App. 1-3.

In late 2007 and early 2008, Eyles also began having significant attendance issues and was in the final stages of progressive discipline.[12]  Eyles did not dispute that he was missing work (the big picture) but again argued with Uline over minute details.[13]  Specifically, on the first six absences noted in the warning, he claims that since he was sick, he should not have been written up.[14]  Uline's attendance policy does not provide for excused absences for sick time unless it qualifies for FMLA leave.[15]  With respect to the seventh absence, Eyles claims he obtained approval for a week's vacation, then changed his mind, came to work one day that week, then changed his mind again and did not come to work the rest of the week.[16]  Uline had scheduled someone else to cover for him, but assumed when he changed his mind and showed up, he would work the rest of the week and was upset that he disappeared again.[17]  His "what's the big deal, you originally said I had vacation" argument did not sit well with Uline.[18]

## C.    PLAINTIFF'S BEHAVIORAL ISSUES

Shortly after receiving the final warning for attendance, Eyles admits that he gave Uline's Human Resources Manager, Anita Chauhan, a "hard time" relating to a requested transfer.[19]  Eyles does not recall why he got upset, but admits he was out of line.[20]  Uline viewed this as part of a pattern of unacceptable behavior.[21]

---

[12] App. 8-9.
[13] App. 8-10; App. 43; App. 44.
[14] App. 10-11.
[15] App. 1-3.
[16] App. 9-10; App. 12-13; App. 43.
[17] App. 1-3.
[18] App. 1-3.
[19] App. 12; App. 45.
[20] App. 18.
[21] App. 1-3.

Shortly after this incident, on February 15, 2007, Eyles sent an e-mail to the President of Uline.[22]  In this e-mail he states that management is "manipulating the system" in not giving pickers proper credit for orders, and goes on to state that the conduct is "stealing" and "dishonest" and that [managers] "cheat."[23]  He had not first brought the concern to the attention of his manager, or his manager's manager, Jim Henegar, before sending this inflammatory e-mail.[24]  Although he apologized to Henegar for not first giving him an opportunity to explain the counts, the damage was already done.[25]  Since Eyles was paid an hourly wage, the number of orders picked had no effect whatsoever on how much he was paid.[26]  When questioned about the basis for his inflammatory statements in the e-mail such as "stealing" and "manipulating the system," he admits that he has no basis for making those allegations.[27]  Eyles describes Henegar as "understandably pissed off" about the e-mail, and Henegar told him that if he had any problems in the future to come to him first.[28]

Henegar viewed Eyles' conduct as once again showing very poor judgment.[29]  Had Eyles just come to him first, he could have explained how the counts were made and explained why Eyles was mistaken about perceived errors.[30]  Henegar researched the issue and found only a handful of perceived errors and in each case they resulted from a shift change and someone not being able to read the "pickers'" handwriting and therefore coding the count to a

---

[22] App. 19; App. 48.
[23] *Id.*
[24] App. 20.
[25] App. 20; App. 1-3.
[26] App. 21.
[27] App. 22; App. 23.
[28] App. 24-25.
[29] App. 1-3.
[30] App. 1-3.

general warehouse number.[31]   Further, this had nothing to do with how employees were paid.[32] There was no stealing, dishonesty, or manipulation.[33]   Had Eyles just asked Henegar before he wrote the inflammatory e-mail, Henegar could have explained this to him.[34]

### D.   PLAINTIFF DISREGARDED HENEGAR'S DIRECTIVE

Eyles' shift began at midnight and ended at 8:30 a.m.[35]   He had one hour off for lunch and admits he performed no work during this lunch hour.[36]   He therefore only actually worked 7.5 hours, but was paid for 8 hours time each day.[37]   Working five days a week, assuming he worked his regular schedule, he therefore only actually worked 36.5 hours, but was paid for 40 hours.[38]   He was therefore paid for 3.5 hours each week for time not worked.[39]

Uline's time-keeping system also rounded time to the nearest 15-minute interval.[40]   For example, if Eyles clocked in at 12:07 a.m., the clock would round the time to 12:00 a.m.[41]   If he would clock out at 8:23 a.m., it would round the time to 8:30.[42]   As might be expected, a few employees would take advantage of this.[43]   In addition to reducing their actual work time from 7.5 hours to closer to 7 hours, they could also watch the clock and clock out at 8 minutes after their shift was over to be paid for the full 15 minutes, due to rounding.[44]   Uline's

---

[31] App. 1-3.
[32] App. 1-3.
[33] App. 1-3.
[34] App. 1-3.
[35] App. 26-28.
[36] App. 28.
[37] App. 29-30.
[38] App. 1-3.
[39] *Id.*
[40] App. 1-3.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*

time-keeping system allowed for manual adjustments to make the time recorded in the system more closely match the actual time worked.[45]

Eyles claims he happened upon minutes of a managers' meeting which he believed showed improper adjustments to time records.[46]   The memo mentions employees clocking out late to be paid for time not worked and the company making corresponding adjustments.[47]   It makes no mention of shorting employees pay for time actually worked.[48] Despite Henegar's previous warning to come talk to him first about concerns in the workplace, Eyles once again jumped to erroneous conclusions and made copies of the document, handed it out to some employees and stuffed it in the lockers of others.[49]  He told them that the Company was "stealing money and lying about it."[50]  He admits that he jumped to this conclusion without talking to Henegar and without having any knowledge one way or the other whether there were issues with employees manipulating the system to be paid for time not worked.[51]

Had Eyles come to Henegar, Henegar could have explained the time clock rounding to him.[52]  Eyles admits that at the time he was giving his "stealing and lying speeches," he did not understand the time clock rounding.[53]  Henegar could also have reminded him that employees were only working 7.5 hours and being paid for 8.[54]  Finally, Henegar could have shown Eyles his time records, where it was obvious that Eyles was taking advantage of the rounding – he almost always clocked out before his shift was over, and on the few occasions

---

[45] *Id.*
[46] App. 30; App. 49.
[47] *Id.*
[48] *Id.*
[49] App. 31.
[50] App. 32.
[51] App. 33.
[52] App. 1-3.
[53] App. 34.
[54] App. 1-3.

where he would stay late, he would wait until the time clock "clicked over" to the 8-minute mark

so it would round his time up and he would get more overtime.[55]

### E.     PLAINTIFF'S COMPLAINT TO THE DEPARTMENT OF LABOR

       Eyles was discharged on March 14, 2007. After he was discharged, he filed a

claim with the U.S. Department of Labor ("DOL").[56] Uline offered to pay, through the DOL,

Eyles "best case" claim for instances where the time records were changed – the sum of

$71.67.[57] He acknowledges that Uline sent him a DOL form acknowledging receiving the

money, but he refused to sign.[58] The form was actually the form WH-58 used by the DOL.[59] He

does not disagree with the amount and admits this is the only amount he is claiming in this case,

but he just objects to signing the DOL's acknowledgement form.[60]

       Eyles claims that other employees at Uline questioned the notion of changing time

records, but none of them were fired.[61] Other employees received backpay checks through the

DOL and none of them were discharged.[62]

### III.     ARGUMENT AND AUTHORITIES

### A.     OVERTIME UNDER THE FLSA

#### 1.     Plaintiff is not owed any overtime pay for "gap time."

       "The FLSA requires employers to pay overtime compensation to employees who

work more than 40 hours per regular workweek."[63] It also provides that employers must pay at

---

[55] App. 1-3.
[56] App. 35.
[57] App. 35-36.
[58] App. 37.
[59] App. 38; App. 50.
[60] App. 39.
[61] App. 40; App. 41.
[62] App. 1-3.
[63] See *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000), *citing* 29 U.S.C. § 207.

**DEFENDANT ULINE, INC.'S**
**BRIEF IN SUPPORT OF ITS MOTION FOR**
**FINAL SUMMARY JUDGMENT AS TO ALL CLAIMS**                Page 8

least minimum wage. Since Eyles earned well in excess of minimum wage, only the overtime provision is at issue in this case.

In order to prove an overtime claim under the FLSA, Eyles must prove that he worked in excess of 40 hours per week and was not paid for time worked. He cannot meet his burden of proof in this case because he was only actually working 37.5 hours per week, but being paid for 40. There is, therefore, a 2.5 hour per week "cushion" of him being paid for time not worked. He must come forward with a time record showing more than 43.5 hours (40 hours actually worked plus 3.5 hours paid lunch periods) and establish that during that workweek, he worked more time, but the time record was adjusted downward. There are no such workweeks.

The case law defines the time at issue as "gap time." In *Adair v. City of Kirkland,* 185 F. 3d 1055, 1062, n. 6 (9th Cir. 1999) the court noted that "gap time" refers to the time that is not covered by the overtime provisions of the FLSA (because it does not exceed the 40 hour per week threshold) and is not covered by the minimum wage provisions because the employee earns more than minimum wage. If an employee is not actually working more than 40 hours per week and his total weekly wage meets the minimum wage standards of the FLSA, there is no FLSA violation.[64]   There were no changes to time records that exceeded the gap time and he cannot assert an FLSA claim for unpaid overtime.

### 2.   Uline's rounding and changes to time records do not violate the FLSA

Uline's timekeeping practices comply with the DOL's regulations. Specifically, 29 C.F.R. § 785.48 permits both rounding and changes to time records. First, part (a) provides that time clocks are not even required, but where they are used, employees who voluntarily come

---

[64] *Hensley v. MacMillan Blodel Containers, Inc,* 786 F. 2d 353, 357 (8th Cir. 1986).

in before their regular starting time, or remain after their shift ends; do not have to be paid for such periods as long as they do not engage in any work. It goes on to state that their early or late clock punching may be disregarded, which is what Uline believed when it adjusted the records. Second, in part (b) the DOL noted that it has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of rounding the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. The regulation then states that this arrangement averages out so that the employees are fully compensated for all the time they actually work. With both of the practices at issue being specifically allowed by the DOL regulations, Eyles had no claim for unpaid time.

Notwithstanding the fact that these practices are clearly permissible, Uline researched the time records and in every instance of a change, it offered to pay Eyles his "best case" for unpaid time - $71.67. The offer was first made through the DOL. Since Eyles admits the $71.67 is all he is claiming, and it is actually far more than the FLSA requires, there is no fact issue to be litigated regarding unpaid wages under the FLSA.

## B.   FLSA RETALIATION

### 1.   Burden of proof

In evaluating summary judgments in FLSA retaliation cases, the courts have adopted a burden shifting approach similar to Title VII cases. As applied to FLSA retaliation cases, the plaintiff must make a *prima facie* showing of: (1) participation in protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse employment action.[65] Once the plaintiff meets this initial burden, the employer

---

[65] *Hagan v. Echostar Satellite, L.L.C.*, 529 F. 3d 617, 624 (5th Cir. 2008).

DEFENDANT ULINE, INC.'S
BRIEF IN SUPPORT OF ITS MOTION FOR
FINAL SUMMARY JUDGMENT AS TO ALL CLAIMS                                Page 10

must articulate a legitimate, non-discriminatory reason for its decision. The burden then shifts

back to the plaintiff to demonstrate that the proffered reason is a pretext for retaliation.[66]

### 2. Protected activity under the FLSA

The Fair Labor Standards Act provides that it is unlawful for an employer:

> ...to discharge or in any other manner discriminate against any
> employee because such employee has filed any complaint or
> instituted or caused to be instituted any proceeding under or related
> to this chapter, or has testified or is about to testify in any such
> proceeding, or has served or is about to serve on an industry
> committee. *29 U.S.C. §215(a)(3).*

The Seventh Circuit has recently addressed what the term "file any complaint"

means.[67]    The court held that in order to be protected, the employee must complain in writing to

an employer, court or administrative body.  In finding that verbal complaints are not sufficient,

the Court provides an extensive discussion of case law from other circuits, and distinguishes the

language of the statute from other employment laws such as Title VII.  The case law is clear

under Title VII that verbal complaints of discrimination are protected activity because the statute

protects an employee who "opposed any practice."  The FLSA contains no such language, but

protects only employees who "file any complaint."

The Fifth Circuit a year earlier addressed what constitutes filing a complaint

under the FLSA in *Hagan v. Echostar Satellite, L.L.C.,* 529 F. 3d 617, 624 (5th Cir. 2008).  It did

not go as far as the Seventh Circuit in actually requiring a writing, but affirmed the District

Court's finding that "not all 'abstract grumblings' or vague expressions of discontent are

actionable as complaints."[68]  Further, the employee must "step outside the role" of his duties as

---

[66] *Id.*
[67] *Kasten v. Saint-Gobain Performance Plastics Corp.,* 2009 U.S. App. LEXIS 13913 (7th Cir. 2009).
[68] *Id. at 626.*

an employee to make clear to the company that he was taking a position adverse to the company.[69]

### 3. Plaintiff did not make a protected complaint prior to his discharge

Plaintiff did engage in protected activity – filing a complaint with the DOL - but this did not occur until after he was discharged by Uline. He did not "file any complaint" while employed by Uline. He relies on his handing the meeting minutes to co-workers and placing them in lockers. This falls into the category of "generalized grumbling" and does not rise to the level of "making clear to the company" that he was making a claim for overtime under the FLSA. This does not meet the statutory definition of filing a complaint.

Even if the Court read into the statute language similar to Title VII's protections for "opposing any practice," Plaintiff's conduct would still not meet the standard. Specifically, courts are frequently faced with employees who claim their behavior in trying to "spread the word" is protected activity and they uniformly reject such a notion. For example, in *Jeffries v. Harris County Community Action Ass'n.,* 615 F. 2d 1025 (5th Cir. 1980) the plaintiff had distributed to co-workers copies of confidential documents and personnel records to "call attention to what she perceived to be an unlawful employment practice.[70] The court held that not all "opposition" activity is protected.[71] An employee's conduct must be reasonable in light of the circumstances and surreptitious copying and disseminating of documents is not reasonable.[72] Plaintiff in this case has no excuse for his conduct in copying the meeting notes,

---

[69] *Id. at 628.*
[70] *Id.* at 1036.
[71] *Id.*
[72] *Id.*

handing them out to co-workers and placing them in employee lockers. Even under the broader definition of protected activity under Title VII, this type of conduct is not protected.[73]

### 4. Uline had legitimate, non-retaliatory reasons for discharging Plaintiff

With a history of performance and attendance issues, Uline made a legitimate request of Plaintiff following his inappropriate e-mail to the President (which had nothing to do with the FLSA). Henegar told him that if he had any issues at all at work in the future, he should come to Henegar first. Eyles admits that he completely disregarded this request and instead chose to take the confidential meeting minutes from the manager's office and distribute them to his co-workers. This was essentially the last straw with an employee who had a long history of being unwilling or unable to follow the rules.

### 5. Plaintiff cannot meet his ultimate burden of proof

Even if the Plaintiff established a *prima facie* case, once Uline proffers its legitimate reasons for discharging him, his *prima facie* case "dissolves."[74] The Plaintiff must establish that "but for" his protected activity, he would not have been discharged.[75] In *Hashop v. Rockwell Space Operations Co.,* the employee, like Eyles, complained about a number of things over the years. Unlike Eyles, he had in fact made a protected complaint about FLSA issues. Not satisfied with the Company's response to one of his complaints, he secretly tape recorded a conversation in hopes of gathering proof to support his complaints. However, the conversation was not an actual protected complaint of him bringing forward his FLSA issues to Human

---

[73] *Douglas v. Dyn McDermott Petroleum Operations Co.,* 144 F. 3d 364, 374 (5th Cir. 1998).
[74] *Hashop v. Rockwell Space Operations Co.,* 867 F. Supp. 1287, 1300 (S.D. Tex. 1994).
[75] *Id. at 1301.*

Resources or management. He could therefore not prove that "but for" his prior complaint about an FLSA violation, he would not have been discharged.[76]

Eyles had a history of performance issues and complaints. While admitting that he made errors pulling orders for customer and he had the actual number of absences stated in his warnings, he complained about minor details relating to what was stated in his warnings. He also made a completely unsupported complaint to Uline's President about "stealing and lying" when a simple conversation with local management could have resolved the issue. He also lost his temper with the Human Resources Supervisor regarding a transfer. None of this had anything to do with FLSA issues.

Although he did not make a true protected complaint until after he was discharged, Uline's handling of the after-the-fact DOL complaint shows how it made every effort to do the right thing and there was no retaliatory motive. Had Eyles done what Henegar told him to do following the e-mail to the President, and come forward with his concerns regarding any workplace issue, he would not have been discharged and the issues could have been resolved. In other words, the final event leading up to his discharge was not his making a protected complaint, but the fact that he chose a completely different course of conduct – taking the confidential meeting notes and distributing them. A refusal to follow work-related instructions is a legitimate reason for discharging an employee, even one who had a history of making protected complaints.[77]

---

[76] *Id. at 1301.*
[77] *Pacheco v. Witing Farms, Inc.,* 365 F. 3d 1199, 1207 (10th Cir. 2004).

## IV.  <u>CONCLUSION</u>

Uline did not violate the FLSA.  It paid Eyles all of the money that was owed to him under the FLSA.  Further, he was not retaliated against because he never made a protected complaint prior to his discharge.  He complained about a number of workplace issues, and was rightfully instructed to follow proper protocol for future issues.  When he refused to follow this directive and distributed the confidential meeting notes, the company was well within its rights to discharge him.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that its motion for summary judgment be granted, and all of Plaintiff's claims be dismissed.

William L. Davis
State Bar No. 05563800
davisw@jacksonlewis.com
Caroline Ibironke, Esq.
State Bar No. 24050803
ibironkec@jacksonlewis.com
Jackson Lewis, LLP
3811 Turtle Creek Boulevard, Suite 500
Dallas, Texas 75219
PH:    (214) 520-2400
FX:    (214) 520-2008

ATTORNEYS FOR DEFENDANT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading was delivered via certified mail, return receipt requested, to the following counsel of record on the _8th_ day of July, 2009:

> Carmen Artaza, Esq.
> Lee & Braziel, LLP
> 1801 N. Lamar, Suite 325
> Dallas, Texas  75202

_____
William L. Davis